# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| JOHN V.[1], | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Civil Action No. 7:19-cv-00203 |
| | ) |
| ANDREW SAUL, | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Plaintiff John V. ("John") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433.[2] John alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) weigh the medical opinion of his treating physician; and (2) assess John's allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **DENY** John's Motion for Summary Judgment (Dkt. 13) and **GRANT** the Commissioner's Motion for Summary Judgment (Dkt. 15).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] This case is before me by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

support the Commissioner's conclusion that John failed to demonstrate that he was disabled under the Act.³ Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## **CLAIM HISTORY**

John filed for DIB in December 2014, claiming that his disability began on January 15, 2013, due to chronic pain in his neck, shoulders, arm, and back, numbness in arms, hands, and legs, limited mobility and loss of upper body strength, complications from neck dissection, scar tissue, radiation and chemotherapy treatments, and four spinal surgeries, and persistent loss of stamina due to health issues. R. 210, 213. John's date last insured was March 31, 2013; thus he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. R. 13, 210; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied John's applications at the initial and reconsideration levels of administrative review. R. 72–79, 81–88. On August 29, 2017, ALJ Michael Dennard held a hearing to consider John's claims for DIB. R. 34–71. Counsel represented John at the hearing, which included testimony from vocational expert ("VE") Barry

---

³ The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

Hensley. On December 8, 2017, the ALJ entered his decision analyzing John's claims under the familiar five-step process[4] and denying his claim for benefits.[5] R. 13–28.

The ALJ found that John was insured at the time of alleged disability onset and that he suffered from the severe impairments of degenerative disc disease, other and unspecified arthropathies, soft tissue tumors of the head and neck, and radiculopathy.[6] R. 16. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. R. 16. The ALJ specifically considered listing 1.04 (disorders of the spine), listing 13.02 (soft tissue cancers of the head and neck), and 11.14 (peripheral neuropathy). R. 16–17.

The ALJ concluded that John retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 17. Specifically, John could lift or carry 20 pounds occasionally and ten pounds frequently, and sit, stand, or walk for six hours in an eight-hour workday. Id. John could only occasionally operate hand controls with his left hand and work in humidity, wetness, and extreme cold. Id. The ALJ determined that John was not capable of

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] John was 54 years old on his date last insured, making him a person closely approaching advanced age under the Act. R. 26.

[6] The ALJ determined that John's hypertension, hyperlipidemia, seasonal allergies, gastroesophageal reflux disease ("GERD"), and dyspepsia were controlled with medication, and his fatty infiltration of the liver, incomplete right bundle branch block, left hemi-block, atrophic left testicle, indeterminate pulmonary nodule of less than 5 mm, and chronic water moistening related to radiation for throat cancer in 2002, did not cause any work related limitations, and thus these conditions were either non-severe or not medically determinable. R. 16.

performing his past relevant work as a real estate agent. R. 25. However, the ALJ determined that there were jobs that existed in significant numbers in the national economy that John could perform, including counter clerk, information clerk, and office helper. R. 26–27. Thus, the ALJ determined that John was not disabled. R. 28. John appealed the ALJ's decision and the Appeals Council denied his request for review on January 24, 2019. R. 1–4.

## ANALYSIS

John alleges that the ALJ erred by failing to properly: (1) weigh the medical opinion of his treating physician, Jonathan Carmouche, M.D.; and (2) assess John's allegations regarding his symptoms.

### A. Medical History Overview

John has a history of chronic back and neck pain, and underwent a laminectomy and discectomy in approximately 1982 and 1983, long before his alleged onset date in January 2013.[7] R. 297, 414. In March 2013, John reported "severe neck and left shoulder pain" to his orthopedic doctor, Robert E. Cassidy, M.D. and, on examination, had weakness and decreased sensation in his left arm and reduced range of motion in his neck. R. 358. X-rays showed cervical degenerative changes at C5-6 and 6-7, with collapse and spurring, and Dr. Cassidy recommended he see a neurologist. Id. John presented to Dr. Carmouche in April 2013 for an evaluation for cervical spine surgery, complaining of radiating neck and shoulder pain. R. 414. On examination, he had tenderness of the neck, but normal range of motion and motor function, with no atrophy or sensory deficits. R. 413. Dr. Carmouche assessed foraminal stenosis and indicated he could "potentially do a left sided foraminotomy at C5-6 and C6-7." R. 416.

---

[7] John was diagnosed with squamous cell carcinoma in 2002, also long before his alleged onset date, and had a radical neck dissection in 2002, followed by chemotherapy and radiation. R. 297. An otolaryngologic evaluation in August 2012 showed no recurrence of the cancer. R. 421, 460.

Dr. Carmouche then performed surgery on May 6, 2013, about 5 weeks after John's date last insured of March 31, 2013. R. 326. Post-surgery, John had multiple follow-up appointments with Dr. Carmouche, where he complained of neck and arm pain, numbness, and tingling, but on exam, had generally intact strength, sensation, and reflexes, and no sensory deficits.[8] R. 331–32, 399, 401. By August 2013, John described his pain as "intermittent and moderate." R. 331. John attended multiple physical therapy session in September and October 2013, but cancelled his last three appointments, and did not complete his plan of care. R. 329, 392. In December 2013 and early 2014, John had several rounds of cervical steroid injections, and continued to complain of neck pain and left arm weakness. R. 258, 260, 262, 264. On exam, John again had normal range of motion, strength, and reflexes, R. 265–66. In November 2014, eight months after John's date last insured, Dr. Carmouche performed a second surgery, anterior cervical discectomy and fusion at C5-6 and C6-7. R. 374. Following this second surgery, John followed up with Dr. Carmouche and a pain management doctor through 2016, with continued complaints of pain. In August 2016, noting that X-rays showed a "solid fusion" and there was "no stenosis that fully explains his symptoms," Dr. Carmouche recommended John seek a second opinion. R. 687.

1. Medical Opinion Evidence

In April and September 2015, respectively, state agency physicians Richard Surrusco, M.D. and Margaret Burke, M.D., reviewed the record and both concluded that John was capable of a limited range of light work. R. 76–77, 84–87. The ALJ gave these opinions significant weight. R. 23.

On May 17, 2016, John's treating doctor, Dr. Carmouche, completed two separate Medical Source Statements of Ability to do Work-Related Activities (Physical), pertaining to the

---

[8] John had reduced left triceps strength. R. 332, 399, 402.

time periods before and after John's date last insured. R. 478–81, 482–85. In the Medical Source Statement for the Time Period of January 15, 2013 through March 31, 2013, Dr. Carmouche indicated that John could lift less than ten pounds, but had no limitations in sitting, standing, or walking, and required no rest periods during the workday. R. 478–79. Dr. Carmouche found a number of exertional limitations, including that John could never climb, kneel, crouch, crawl, or stoop, and was limited to occasional reaching, handling, fingering, and feeling, due to weakness in arms and pain, but had no environmental limitations. R. 480–81. Dr. Carmouche also indicated John would be absent more than three times per month due to his limitations. R. 81. In the Medical Source Statement for the Time Period from April 1, 2013 through May 17, 2016, Dr. Carmouche had similar findings, with the added limitations of a need for extra rest periods, specifically because John required feeding through a tube, and limited speaking due to vocal cord paralysis following surgery. R. 483. The ALJ gave both of Dr. Carmouche's Medical Source Statements some weight. R. 23–24.

The ALJ also references opinions from John Zimmerman, M.D., and Scott S. Yang, M.D., in March and May, 2013, respectively. R. 23. Dr. Zimmerman recommends a soft cervical collar while watching television or reading, to avoid aggravating the nerve root prior to surgery, while Dr. Yang recommends a variety of restrictions while John heals from his cervical spine surgery, including using an Aspen cervical collar, and avoiding lifting over five pounds, twisting, pulling, reaching, and extended sitting. R. 326, 408. The ALJ gave Dr. Zimmerman some weight, writing that Dr. Zimmerman was John's primary care physician, and "had treated his health issues for many years," but emphasizing that the opinion "appears to be a suggestion to avoid neck pain until [his] surgery with Dr. Carmouche in May of 2013." R. 23. The ALJ gave Dr. Yang's opinion little weight, emphasizing that it was "written for a limited period as [John]

6

healed from surgery on his cervical spine after May 6, 2013 . . . a month after the date last insured." Id.

### B. Treating Physician's Medical Opinions

John argues that the ALJ erred by failing to give controlling weight to Dr. Carmouche's opinions. John asserts that the ALJ failed to "specifically point to any particular or specific evidence that undermined Dr. Carmouche's opinions" or acknowledge that John's "initial appointment with Dr. Carmouche was only 23 days after his date last insured" and included analyzing an MRI taken "only three days after [John's] date last insured." Pl.'s Br. at 21, Dkt. 14. The Commissioner counters that substantial evidence supports the ALJ's assessment of Dr. Carmouche's opinion, noting that the treating physician's opinion does not "bind the ALJ on the issue of functional capacity," but instead must be properly assessed under the Regulations.

Dr. Carmouche issued two May 2016 opinions, one focused on the time period prior to John's date last insured (January through March 2013), and one focused on the time period after John's date last insured (April 2013 through May 2016). R. 478–81, 482–85. These opinions, if wholly credited by the ALJ, would preclude competitive employment, in large measure because Dr. Carmouche indicated John would be absent more than three times per month due to his limitations, could only occasionally reach with both hands, and could lift less than ten pounds.[9] R. 81. Dr. Carmouche also found a number of other exertional limitations, but no environmental limitations, and no limitations in sitting, standing, or walking. R. 478–81. In the opinion focused on the time period after the date last insured, Dr. Carmouche added a limitation of extra rest

---

[9] The vocational expert testified that all hypothetical jobs suggested would be eliminated if the individual missed more than one day a month from work, and that a limitation to occasional use of both the right and left hand for reaching eliminates competitive work. R. 68. Further, a limitation to lifting less than ten pounds results in a sedentary exertional level. R. 70.

7

periods to allow for tube feeding, and limited speaking. R. 483. The ALJ gave Dr. Carmouche only some weight, noting he was a specialist, but finding the record did not support the extent of the limitations imposed. R. 23–24.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."[10] 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion"). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's

---

[10] The social security regulations regarding the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017. See 20 C.F.R. §§ 404.1520c, 416.920c (setting out rules for claims filed on or after March 27, 2017, including that no specific evidentiary weight, including controlling weight will be given to any medical opinions). However, as this claim was filed prior to the effective date of the amended rule, I will apply the rules in 20 C.F.R. §§ 404.1527(c), 416.927.

8

specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09cv622, 2010 WL 6621693, at *10 (E.D.Va. Dec. 29, 2010). However, the ALJ "need not mechanically discuss every factor when choosing to afford a treating physician's opinion less weight, as long as the ALJ articulates the reasoning behind the decision." Haass v. Comm'r, Soc. Sec. Admin., No. CV BPG-17-1639, 2018 WL 2118705, at *1 (D. Md. Apr. 4, 2018).

Here, the ALJ appropriately considered these factors and the record, in determining that the opinions of Dr. Carmouche regarding January through March 2013, and April 2013 through the date of the ALJ decision merited only some weight. The ALJ acknowledged that Dr. Carmouche was a treating physician, a specialist in orthopedic spine surgery, and had actually performed the surgeries on John's spine in May and November 2013, but concluded that his opinion was "more restricted than warranted by the medical evidence of record." R. 23–24. In support, the ALJ emphasized that, although John clearly had neck pain and radiculopathy, his physical exams "showed no or little mobility problems." R. 24. The ALJ also noted that Dr. Carmouche did not consider environmental limitations for John. Id. In support, the ALJ pointed to specific portions of the record. Id. Elsewhere in his opinion, the ALJ discussed these records at length, including that prior to the surgery, in April and May 2013, physical examination showed normal range of motion in the neck and shoulder, intact motor function, no sensory deficits, and normal reflexes, coordination, and stable gait. R. 21, 24. The ALJ wrote that at follow-up visits after surgery, in May and June 2013, physical examination again showed intact motor function, except for left triceps at 3/5. R. 22. The ALJ summarized the findings from these physical examinations as follows:

> Physical examinations with [John's] medical providers in early 2013 did not show many limitations from his degenerative disc disease and neck pain. [John] mentioned he did not drop objects and had no balance difficulty, no arm weakness, and no loss of coordination. [John] was doing home exercises, such as walking and arm lifts. Physical examinations showed his gait was stable. His neck was tender to palpation, but he had normal range of motion in the neck an shoulders. Motor function was intact throughout the bilateral upper extremities and there was no atrophy. He also had no sensory deficits and normal reflexes.

R. 25. Specifically regarding Dr. Carmouche's conclusions for April 2013 through the date of the opinion, the ALJ noted that it "was written for a period after the date last insured" and that Dr. Carmouche had provided a different opinion for the period actually under consideration.[11] R. 24. Further, the ALJ gave significant weight to the state agency physicians, who both found John capable of a limited range of light work. R. 23.

The ALJ adequately considered the factors outlined in 20 C.F.R. § 416.927(c)(2) and justified the weight afforded with specific reasons, including that the records during the relevant period do not show mobility problems on examination, nor significant continued issues with range of motion, motor function, balance, arm weakness, or coordination.[12] Having reviewed the record as a whole, I conclude that substantial evidence supports the ALJ's decision to discount the opinions of Dr. Carmouche.

**C. Subjective Allegations**

John argues that the "ALJ's assessment of [his] allegations is not supported by substantial evidence." Pl.'s Br. at 27, Dkt. 14. John asserts that his daily activities are limited, disagrees with

---

[11] To the extent that John argues that the ALJ improperly failed to consider evidence after the date last insured, I find that the ALJ adequately considered all the evidence in the record. The ALJ indicated he considered the entire record (R. 15, 17) and specifically discussed evidence both prior to John's alleged onset date (R. 18) and after his date last insured (R. 20–22). See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (noting that, when the Commissioner "stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word").

[12] While John's use of a feeding tube, necessitating extra rest periods and limited speaking, could certainly impact the ability to work, this issue pertained to the time period after the date last insured, and there is no evidence showing a link to before his date last insured. R. 483.

10

the ALJ's characterizations of his surgery as "conservative," and points to records that he claims contradict the ALJ's conclusion that examinations in early 2013 showed normal range of motion, and no motor, reflex, or sensory deficits.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. <u>Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims</u>, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).[13] First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[14] <u>Id.</u> at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. <u>Id.</u> §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." <u>Id.</u>

---

[13] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the Social Security Administration. <u>Heckler v. Edwards</u>, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." <u>Pass v. Chater</u>, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

[14] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." <u>Id.</u> Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." <u>Id.</u>

The ALJ's opinion includes a detailed discussion of John's medical history, both before and after his date last insured, along with John's allegations, and the ALJ adequately supported his finding that John's allegations were not entirely consistent with the medical evidence and other evidence in the record. The ALJ specifically noted John's testimony that he had pain in his arms, could not turn his neck, and had tingling down to his fingers since early 2013, and, as a consequence, had difficulty standing, reaching, and driving. R. 18. However, the ALJ concluded that John's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 24. In support, the ALJ noted that John reported "finishing the sale of three properties in early 2013 as a real estate agent," performing home exercises, and "going on a family vacation to the beach and desiring to swim in the pool" only a few weeks after his May 2013 surgery.[15] R. 24. The ALJ wrote that, "[g]iven the complaints of disabling symptoms and limitations, such activities are not limited to the extent one would expect." Id.

The ALJ characterized the medical record as showing "essentially routine and conservative" treatment, which proved "generally successful" in controlling his symptoms. In support, the ALJ references John's reports of improved neck pain in early 2013 following visits to a chiropractor, use of a TENS unit, and medication. R. 24. The ALJ notes that John's provider refused to prescribe him stronger medication in March 2013, instead advising him to use the TENS unit and supplement with over the counter medication, and ultimately refilling his Lortab. R. 25, 417. The ALJ did not attempt to diminish John's treatment, but instead clearly recognized

---

[15] John stresses that he did not ask the doctor about swimming during vacation, but instead "asked about getting in the pool during vacation." R. 404. However, because the phrases "getting in the pool" and "swimming in the pool," are often used interchangeably, I find the ALJ did not misinterpret the medical records. Further, there is no evidence regarding whether John actually did enter the pool while on vacation and the ALJ based his finding on a variety of factors beyond this single statement.

12

he underwent two surgeries, writing that John had "a left discectomy at the C6-C7 level and a foraminotomy at the C5-C6 level" in May 2013 and an "interior cervical discectomy and fusion (ACDF) of C5-C6 and C6-C7 in November 2014." R. 21–22, 25. While John objects to the ALJ's characterization of surgery as "conservative," on balance, the ALJ adequately understood, analyzed and summarized the relevant medical record, including the nature and purpose of the surgeries.

Further, the ALJ noted that John reported improved pain following the surgery, and wrote that physical examinations "in early 2013 did not show many limitations from his degenerative disc disease and neck pain," including no balance difficulty, arm weakness, loss of coordination, or sensory deficits, and normal range of motion, motor function, and reflexes. R. 25. This is reflected in the records from Dr. Carmouche's April 2013 examination. R. 415-16. However, John points to two locations in the record, both from March 2013, shortly before John's surgery, where Drs. Cassidy and Zimmerman noted reduced range of motion, decreased sensation, and weakness in the neck and upper extremities, asserting this contradicts the ALJ's statement that examinations in early 2013 showed normal range of motion, and no motor, reflex, or sensory deficits. However, the ALJ thoroughly discussed both Drs. Cassidy and Zimmerman's findings on physical exam from these appointment, and I find he adequately considered them in conjunction with the entire record. R. 19–20. The ALJ also specifically compared the opinions of Drs. Carmouche and Zimmerman, writing:

> Dr. Zimmerman was [John's] primary care physician, had personally examined [him], and had treated his health issues for many years. However, Dr. Carmouche was [John's] spinal surgeon, and had a more detailed understanding of the issues involving his cervical spine in 2013. [Dr. Zimmerman's] opinion appears to be a suggestion to avoid neck pain until he could have surgery.

R. 23.

At bottom, I find the record provides substantial support for the ALJ's decision; thus, the existence of evidence in the record that could support a different decision does not merit reversing the ALJ. John essentially asks me to reweigh the evidence that was before the ALJ and come to a different conclusion. However, it is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of John's subjective complaints with substantial evidence, and that John is capable of performing work at the level stated in the ALJ's opinion.

## **CONCLUSION**

For these reasons, John's Motion for Summary Judgment is **DENIED** and the Commissioner's Motion for Summary Judgment is **GRANTED** and this case is **DISMISSED** from the court's docket.

Entered:  March 20, 2020

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge